**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 18-cv-2962-WJM-SKC

JUSTIN KERNS, individual, as Personal Representative of the Estate of Amanda
Christensen, and as parent and next friend of C.K., T.K., and B.K,;
ESTATE OF AMANDA CHRISTENSEN;
C.K., a child of Amanda Christensen and Justin Kerns, by and through his/her father
Justin Kerns;
T.K., a child of Amanda Christensen and Justin Kerns, by and through his/her father
Justin Kerns; and
B.K., a child of Amanda Christensen and Justin Kerns, by and through his/her father
Justin Kerns;

      Plaintiffs,

v.

SOUTHWEST COLORADO MENTAL HEALTH CENTER, INC., d/b/a Axis Health
System;
BRIAN ENSIGN;
ANN TREBELHORN;
MORGAN WILLIAMS;
DEBORAH QUAYLE; and
ALFREDO CHAVARRIA;

      Defendants.

---

## OMNIBUS ORDER ON MOTIONS TO DISMISS

---

This lawsuit alleges that Amanda Christensen ("Christensen") received

constitutionally deficient medical care while on an involuntary hold in the Detox Unit at

Crossroads at Grandview in Pagosa Springs, Colorado ("Crossroads"), a healthcare

facility run by Defendant Southwest Colorado Mental Health Center, Inc., d/b/a Axis

Health System ("Axis"), which resulted in Christensen taking her own life.  (ECF

No. 27.)  Justin Kerns ("Kerns"), personally, as personal representative of the Estate of

Amanda Christensen ("the Christensen Estate"), and as parent and next of friend of

Kerns and Christensen's three minor children; the Christensen Estate; and minor

children C.K., T.K., and B.K. (together, "Plaintiffs") sue five individuals and one entity

allegedly responsible in some way for Christensen's death.  Plaintiffs allege violations of

Christensen's federal substantive due process rights and federal due process rights

under 42 U.S.C. § 1983, as well as state law claims for wrongful death, negligence, and

survival action, and a violation of the federal Rehabilitation Act § 504.

Currently before the Court are five motions to dismiss challenging the Amended

Complaint (ECF No. 27).[1]  One motion is brought by Defendants Ann Trebelhorn and

Alfredo Chavarria, Axis staff members in the Detox Unit at Crossroads at the time of

Christensen's death ("Staff Motion").  (ECF No. 33.)  Another motion is brought by

Defendant Debra Quayle ("Quayle Motion").  (ECF No. 45.)  A third motion is brought by

Defendant Morgan Williams ("Williams Motion") and a fourth by Defendant Brian Ensign

("Ensign Motion").  (ECF Nos. 32 & 36.)  The final motion is brought by Axis ("Axis

Motion").  (ECF No. 35.)[2]  Axis, Williams, and Ensign also brought a sixth motion to

---

[1] Although each motion is captioned "Motion to Dismiss," each is more accurately a partial motion to dismiss.  No defendant challenges Plaintiffs' state law claims.  Thus, the Court will not address the state law claims in this Order.

[2] The Court notes that Quayle is separately represented and filed her own motion. Trebelhorn and Chavarria share counsel, and filed a single joint motion.  Axis, Ensign, and Williams share counsel, but filed three separate motions plus an additional joint motion on a separate Rule 12 issue (which, as noted, was struck for noncompliance with the undersigned's Revised Practice Standards).  The Court observes that the filing of multiple motions that rely on many of the same facts and basic legal principles needlessly complicates the Court's docket. The Court strongly encourages jointly represented parties to file joint motions in the future.  The Court will grant requests to exceed page limits under such circumstances, and cites as an example of this approach Plaintiffs' 45-page Omnibus Response to the motions to dismiss. (*See, e.g.*, ECF No. 51.)

dismiss, which was struck by the Court because the undersigned's Revised Practice Standard III.D.2 requires that all requests for relief by a particular defendant must be brought in a single Rule 12 motion. (ECF No. 92.)

## I. BACKGROUND

The Court assumes the truth of the following facts pled in the First Amended Complaint for the purpose of resolving the pending motions.

This case arises from the tragic and untimely death of Christensen while she was involuntarily detained at Crossroads in November 2016. Crossroads is one of Axis's seven facilities. (ECF No. 27 ¶ 10.) At the time of the events that form the basis for this lawsuit, Ensign, Trebelhorn, Williams, Quayle, and Chavarria ("Individual Defendants") were employees of Axis. (*Id.* ¶¶ 11–15.) Ensign was the Acute Treatment Unit clinical team lead. (*Id.* ¶ 11.)

Christensen suffered from borderline personality disorder and bipolar II disorder, and struggled with substance abuse. (*Id.* ¶¶ 25–26.) On March 22, 2016, Christensen was arrested and charged with criminal mischief, and subsequently pled guilty to that charge and received one year of probation under a deferred sentence. (*Id.* ¶¶ 27–28.) The terms of her probation prohibited her from using alcohol, and required her to submit to drug and alcohol testing. (*Id.* ¶ 28.)

Christensen sought professional help from Dr. Paul Mattox, a psychiatrist in Durango, Colorado, and when Dr. Mattox was unavailable, Christensen often called the Axis Health System crisis hotline. (*Id.* ¶¶ 31–32.) In June 2016, Christensen began seeing Josh Bramble ("Bramble"), a licensed professional counselor. (*Id.* ¶ 33.) He

helped her through several acute crises in the summer of 2016, and in the fall of 2016, encouraged Christensen to enter a full-time treatment program.  (*Id.* ¶¶ 33–34.)  Around October 1, 2016, Christensen attempted suicide by intentionally overdosing on medication.  (*Id.* ¶ 35.)

Around November 13, 2016, Christensen violated the terms of her probation by drinking heavily, and taking opiates for which she did not have a prescription.  (*Id.* ¶¶ 36, 57, 59–60.)  Kerns wrestled a knife away from Christensen to prevent her from hurting herself.  (*Id.* ¶ 57.)  Bramble called the police because he perceived Christensen as a danger to herself and possibly others.  (*Id.* ¶ 58.)  Police escorted Christensen in handcuffs to the Pagosa Springs Medical Center for evaluation.  (*Id.* ¶ 59.)  Instead of arresting her, Archuleta County law enforcement officials agreed to place Christensen in Axis's custody where she could receive treatment.  (*Id.* ¶¶ 37, 62.)  Plaintiffs allege that "Axis performed similar and related services at the request and direction of Archuleta County . . . although her detention was maintained at the Crossroads facility rather than at either the Archuleta County Detention Center or the La Plata County Jail." (*Id.* ¶ 46.)

During Christensen's booking into Crossroads, the Intake Adminstrator noted that Christensen had a blood alcohol content level of 0.103 and was being admitted in part because she made suicidal statements.  (*Id.* ¶ 68.)  Christensen was placed in the Detox Unit.  (*Id.* ¶ 70.)

On November 14, 2016, Christensen met with Jamie Denier for a crisis assessment.  (*Id.* ¶ 72.)  The ten-page crisis assessment form detailed Christensen's

high suicide risk, mental health diagnosis and symptoms, and history of depression, suicide attempts, self-harm, and substance abuse. (*Id.* ¶¶ 72–74.) The form was saved into the Axis patient database. (*Id.* ¶ 72.) Christensen ranked as "moderate or high risk" in most categories of the suicide risk assessment, but denied attempting to take her own life in October 2016. (*Id.* ¶¶ 76, 80.) Christensen's medical records also stated that Christensen was "exhibiting a deteriorating course leading toward danger to self or others." (*Id.* ¶ 82.) The form also noted that Christensen had been diagnosed with bipolar disorder, an unspecified personality disorder, and alcohol dependence. (*Id.* ¶ 83.) Defendant Ensign, the Acute Treatment Unit clinical team lead, did not review or approve this initial screening form until November 16, 2016.

When Christensen was admitted to Crossroads, Kerns and Bramble contacted the District Attorney's Office for the 6th Judicial District and the Colorado Department of Human Services to arrange for the filing of a petition for Christensen's temporary involuntary commitment to an intensive, 30-day inpatient alcohol treatment program. (*Id.* ¶ 86.) On November 15, 2016, Bramble met with Christensen and told her that he was pursuing involuntary commitment. (*Id.* ¶ 87.) Christensen was distraught upon hearing the news. (*Id.* ¶ 90.) Defendant Williams performed a safety assessment and noted that Christensen was "very escalated" following her meeting with Bramble. (*Id.* ¶ 90.) She did not want to be committed and planned to contest it. (*Id.* ¶ 92.)

After meeting with Christensen at Crossroads, Bramble told Defendant Quayle that Christensen was "at an extremely high risk for completing suicide" and that her October 2016 suicide attempt "was a serious one." (*Id.* ¶ 87.)

On November 18, 2019, Deputy District Attorney Alexander Lowe filed a petition for involuntary commitment for alcohol abuse under Colo. Rev. Stat. § 27-81-112. (*Id.* ¶ 93.)  That same day, Christensen was taken to Mercy Medical Center to refill her anti-anxiety medications.  (*Id.* ¶ 94.)  Defendant Chavarria spoke with Christensen when she returned to Crossroads.  (*Id.* ¶ 95.)  His notes from the meeting state "Patient returned from Mercy ER with Librium and a prescription for Ativan."  (*Id.*)  Chavarria did not record Christensen's emotional, physical, or psychological state at that time.

At approximately 3:45 p.m. on November 18, 2019, Christensen made a phone call supervised by Crossroads.  (*Id.* ¶ 97.)  To make a call, a patient must sit in front of a window with an Axis staff member on the other side.  (*Id.*)  Plaintiffs believe that Defendant Trebelhorn was responsible for monitoring Christensen's call.  (*Id.*)  During the call, Christensen moved out of the chair and slumped to the floor, and was, according to Plaintiffs, "visibly distraught."  (*Id.* ¶ 98.)

At approximately 4:08 p.m., Christensen entered the women's bathroom alone, carrying a tote bag and towel.  (*Id.* ¶ 102.)  She was in the line of sight of facility staff responsible for monitoring Christensen, and in view of the video surveillance system. (*Id.*)  At 4:38 p.m., two women tried to open the bathroom door, but could not because it was locked.  (*Id.* ¶ 103.)  At 5:15 p.m., another woman unsuccessfully tried to open the door and alerted staff that the door had been locked for over an hour.  (*Id.* ¶ 104.) Trebelhorn escorted the woman away from the bathroom.  Around 5:35 p.m., Trebelhorn tried to open the door and found it locked.  (*Id.* ¶ 106.)  Trebelhorn and a male staff member started looking for a key.  (*Id.* ¶ 107.)  A janitor opened the door at

approximately 5:38 p.m.  (*Id.*)

Inside the bathroom, they found Christensen hanging by a towel.  (*Id.* ¶ 109.)
Trebelhorn found scissors, and cut Christensen down at approximately 5:39 p.m.
(*Id.* ¶ 110.)  Someone commenced CPR.  (*Id.* ¶ 111.)  Emergency Medical Services
("EMS") arrived at 5:43 p.m. and found Christensen unresponsive and without a pulse.
(*Id.*)  EMS intubated Christensen, gave her a shot of epinephrine, and continued CPR.
(*Id.* ¶ 112.)  Despite these efforts, Christensen died.  Her cause of death was asphyxia
due to hanging.  (*Id.* ¶ 113.)

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a
claim in a complaint for "failure to state a claim upon which relief can be granted."  The
Rule 12(b)(6) standard requires the Court to "assume the truth of the plaintiff's well-
pleaded factual allegations and view them in the light most favorable to the plaintiff."
*Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).  In ruling
on such a motion, the dispositive inquiry is "whether the complaint contains 'enough
facts to state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atl. Corp. v.
Twombly*, 550 U.S. 544, 570 (2007)).  Granting a motion to dismiss "is a harsh remedy
which must be cautiously studied, not only to effectuate the spirit of the liberal rules of
pleading but also to protect the interests of justice."  *Dias v. City & Cnty. of Denver*, 567
F.3d 1169, 1178 (10th Cir. 2009) (internal quotation marks omitted).  "Thus, 'a well-
pleaded complaint may proceed even if it strikes a savvy judge that actual proof of
those facts is improbable, and that a recovery is very remote and unlikely.'"  *Id.* (quoting

*Twombly*, 550 U.S. at 556).

## III. ANALYSIS

### A.     Individual Defendants' Motions to Dismiss (ECF Nos. 32, 33, 36 & 45)

Plaintiffs contend that the Individual Defendants were "responsible for the monitoring, supervision, care and treatment of Ms. Christensen during her detention at Crossroads, and had an affirmative obligation to protect her health and welfare and constitutional rights." (ECF No. 27 ¶ 66.) Plaintiffs assert three separate claims under 42 U.S.C. § 1983 for alleged violations of Christensen's constitutional rights. The Court will address each claim in turn.

First, the Court pauses to clarify that no defendant has challenged his, her, or its status as a state actor under 42 U.S.C. § 1983. Indeed, Quayle is the only defendant to even suggest that there may be an argument regarding her status as a state actor: in a footnote, she states that she "does not concede [that] she is a state actor or that she was acting under color of law at any time relevant herein." (ECF No. 45 at 7 n.2.) Given that no Defendant squarely raises, much less argues or analyzes the issue, the Court will presume for present purposes that all Defendants were state actors at the time of relevant events. *See United States v. Hunter*, 739 F.3d 492, 495 (10th Cir. 2013) (cursory argument not meaningfully developed by any analysis or citation is deemed waived). The Court notes, however, that there may be a question of whether Defendants are state actors in light of the Tenth Circuit's decision in *Wittner v. Banner Health*, 720 F.3d 770, 771 (10th Cir. 2013).

8

1.    Violation of Substantive Due Process Under the Special Relationship
      Doctrine (Claim 1)[3]

Generally, state actors are liable under the Due Process Clause only for their

own direct actions, and are not responsible for the actions of other private citizens.

*Uhlrig v. Harder*, 64 F.3d 567, 572 (10th Cir. 1995).  There are two exceptions to this

rule.  State officials may be subject to constitutional liability if they: (1) create a danger

that results in a harm to an individual, even if that harm is not ultimately inflicted by a

state official; or (2) if the state has a "special relationship" with the individual who then

suffers harm.  *Id*.  Plaintiffs argue that the special relationship doctrine applies here.

(ECF No. 27 ¶¶ 127–136.)  "A special relationship exists when the state assumes

control over an individual sufficient to trigger an affirmative duty to provide protection to

that individual (e.g. when the individual is a prisoner or involuntarily committed mental

patient)."  *Uhlrig*, 64 F.3d at 572 (citing *DeShaney v. Winnebago Cnty. Dep't of Soc.*

*Servs.*, 489 U.S. 189, 199-200 (1989)).  In other words, the state or its agents become

liable "under 42 U.S.C. § 1983 for failing to protect people from harm if they have

deprived those people of liberty and made them completely dependent on the state for

their basic needs."  *Dahn*, *v. Amedei*, 867 F.3d 1178, 1181 (10th Cir. 2017).

The elements of a substantive due process claim based on the special

relationship doctrine are (1) a special relationship; (2) the defendant knew the plaintiff

---

[3] There is a question of whether this species of substantive due process claim is
appropriate or available when there is another constitutional protection available.  *See*
*Graham v. Connor*, 490 U.S. 386, 395 (1989) (holding that because the Fourth Amendment
provided an "explicit textual source of constitutional protection against this sort of physically
intrusive governmental conduct, that Amendment, and not the more generalized notion of
'substantive due process' must be a guide for analyzing these claims").  However, no party
raises these concerns and therefore the Court will not address them *sua sponte*.

was in danger or failed to exercise processional judgment regarding that danger; (3) the defendant's conduct caused the plaintiff's injuries; and (4) the defendant's actions shock the conscience. *Id.*

Individual Defendants do not address the first two elements, and argue solely that their actions do not shock the conscience and did not cause Christensen's injuries.[4] Further, Ensign challenges Plaintiffs' supervisory liability claim against him for conduct undertaken by his staff. The Court will address these arguments in turn.

a. *Conscience-shocking conduct*

The state actor's behavior must be sufficient to "shock the conscience." *Johnson ex. rel. Estate of Cano v. Holmes*, 455 F.3d 1133, 1143 (10th Cir. 2006). To satisfy this standard, "a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power." *Uhlrig*, 64 F.3d at 574. The defendant's conduct must be of a "degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Id.* The level of conduct required cannot be precisely defined and may evolve over time. *Id.* Under the special relationship doctrine, it is not sufficient to merely show that a defendant abdicated a professional duty, a plaintiff must instead show that such abdication is sufficient to shock the conscience. *Estate of Place v. Anderson*, 398 F. Supp. 3d 816, 833 (D. Colo. 2019). "To meet that standard, the plaintiff must show more than merely negligent conduct on the part of the defendant." *Id.* at 833–34.

---

[4] While Defendants seemingly suggest that no special relationship existed, their arguments are more properly characterized as an argument on the causation element.

1. Chavarria, Quayle, and Williams

Plaintiffs contend that they have robustly supported, through their factual allegations, that the actions or inactions of Chavarria, Quayle, and Williams would shock the conscience of a federal judge. On the facts pled, the Court disagrees.

Plaintiffs posit that after brief, initial intake interactions with Christensen or Bramble, Chavarria, Quayle, and Williams failed to follow up to assure that protocols were put in place and followed by fellow staff members. Specifically, Plaintiffs allege that Chavarria conducted an assessment of Christensen when she returned to Crossroads from obtaining a prescription at Mercy Medical Center. (ECF No. 27 ¶¶ 94–95.) That assessment did not include an assessment of Christensen's emotional, physical, or psychological state. (*Id.* ¶ 95.) Plaintiffs allege that Williams performed a safety assessment of Christensen and recognized that Christensen was "very escalated." (*Id.* ¶ 90.) Plaintiffs allege that Bramble made Quayle aware that Christensen was at a high risk for completing suicide. (*Id.* ¶ 87.)

Finally, Plaintiffs allege that Chavarria, Quayle, and Williams failed to follow "reasonable and professionally-appropriate protocols" such as actively observing Christensen at all times or ensuring that Christensen was under surveillance at all times, and preventing Christensen from gaining access to materials that could be used to inflict self-harm. (ECF No. 51 at 9; ECF No. 63 at 5.) In essence, Plaintiffs allege that these three Defendants were subsequently responsible for overseeing each step of Christensen's ensuing care, and that their failure to do so after their limited, initial interactions with Christensen, is conscience shocking.

The Court finds that even if Chavarria, Quayle, and Williams's alleged

11

conduct—failing to ensure that other staff members at points later in time reasonably carried out their jobs—was an abdication of their professional duties, such conduct does not, on this record, shock the conscience. Plaintiffs have failed to allege facts from which the Court can conclude that after their brief interactions with Christensen or Bramble at the intake phases of Christensen's admission into Crossroads, Chavarria, Quayle, and Williams had any continuing duty or responsibility to monitor or ensure that appropriate procedures were in place for other Crossroads staff to follow during Christensen's subsequent treatment at the facility. Without any factual context as to the scope of these three Defendants' continuing duties, responsibilities and decision-making authority beyond the intake phase of Christensen's admission, the Court has no basis from which to conclude that their alleged actions or omissions shock its conscience.

For these reasons the Court dismisses the substantive due process claim against Chavarria, Quayle, and Williams. However, because the Court cannot say with any degree of certainty that Plaintiffs could never allege additional facts in an amended complaint which would plausibly allege such a claim based on an alleged special relationship between them and these Defendants, this dismissal will be without prejudice.

2.      Ensign

Defendant Ensign joins William's Motion, thus asserting that his actions were also not conscience-shocking. (ECF No. 36 at 8.) Ensign was the onsite supervisor at Crossroads at the time of these events. (ECF No. 27 ¶ 85.) According to Plaintiffs, Ensign did not review or approve Christensen's initial screening form until two days

after her admission. (*Id.*) The import of this delay is unclear. Plaintiffs do not suggest that the delay in review in some manner limited staff access to the electronic medical records. To the contrary, Plaintiffs allege that the "Defendants were on notice regarding the content of this extensive screening paperwork at all relevant times." (*Id.* ¶ 72.) Plaintiffs also allege that Ensign was "responsible for the monitoring, supervision, care and treatment of Ms. Christensen while she was at Crossroads." (*Id.* ¶ 66.)

Plaintiffs' substantive due process claim against Ensign under a direct liability claim fails for the same reasons that the claim against Chavarria, Quayle, and Williams fails. Plaintiffs fail to allege facts to demonstrate that Ensign abdicated his professional responsibilities or unreasonably exercised or failed to exercise his authority, much less did so in a way that shocks the conscience. Instead, Plaintiffs merely allege that Ensign did not timely review Christensen's paperwork, but fail to present any additional facts material to the issue of whether this purported delay had any impact on her care, adverse or otherwise. Plaintiffs also do not allege any facts to support their conclusory contention that Ensign breached his professional responsibilities for monitoring, supervision, care, and treatment of Christensen. Absent such facts, Plaintiffs have failed to allege that Ensign himself *personally* engaged in conscience-shocking conduct.

### 3. Trebelhorn

Trebelhorn raises the same argument as the other Individual Defendants, and insists that she was at most negligent in not observing Christensen more closely. The Court disagrees, and based on the facts pled and the reasonable inferences which can be drawn therefrom, finds that Plaintiffs have adequately alleged that Trebelhorn engaged in conscience-shocking conduct.

Trebelhorn was responsible for monitoring Christensen's calls in the Detox Unit. (ECF No. 27 ¶ 97.) She also was at least on notice of Christensen's mental health history and elevated risk for suicide. (*Id.* ¶¶ 89, 100.) Despite her job requirements and knowledge of these heightened risks, Trebelhorn either recklessly failed to observe Christensen becoming increasingly upset during the telephone call, or watched Christensen take the call and did nothing. (*Id.* ¶¶ 97–100.) Trebelhorn suggests that Plaintiffs cannot allege that she actually monitored the calls or observed Christensen's reaction, and thus her conduct was at most negligent. (ECF No. 33 at 9.) The Court disagrees with this contention as well. Plaintiffs allege that Trebelhorn failed to perform her job duties, either by failing to monitor Christensen's call or failing to properly intervene to help Christensen after the call. In either case, her conduct would constitute a substantial departure from accepted professional standards. *See Yvonne L. ex rel. Lewis v. New Mexico Dep't of Human Servs.*, 959 F.2d 883, 894 (10th Cir. 1992) ("'failure to exercise professional judgment' . . . implies abdication of the duty to act professionally").

After the call, despite the monitoring (or lack thereof), Christensen was able to take a long towel with her into a restroom that locked from the inside, and was permitted to spend over an hour-and-a-half uninterrupted and unmonitored in the bathroom, during which time she took her own life. (ECF No. 27 ¶¶ 102–113.) During this time, Trebelhorn was responsible for monitoring calls in the Detox Unit, and apparently for responding to Detox Unit patients' concerns about bathroom unavailability. (*Id.* ¶¶ 97, 104–106.) Notwithstanding these responsibilities, Trebelhorn left a patient she had previous reason to believe was on the cusp of committing suicide

14

completely unobserved and unmonitored for nearly a full 90 minutes.

Such serious abdication of professional responsibilities at a tragically critical juncture in a patient's mental health treatments shocks the judicial conscience. Christensen was at Crossroads and committed to its care *because* she posed a threat to herself. This abandonment of those very professional duties to monitor Christensen is indeed shocking to the undersigned's conscience. This element of the substantial due process claim as asserted against Trebelhorn has been met.

      b.    *Causation*

Trebelhorn also argues that Plaintiffs have failed to adequately plead causation. Specifically, she argues that the special relationship doctrine is inapplicable because Christensen's death resulted "not from Axis's restrain on Ms. Christensen's ability to act for herself, but from her ability to act *despite* being in custody." (ECF No. 33 at 7.)[5] Trebelhorn relies on *DeRay v. City of Colo. Springs*, 2013 WL 1149550, at *5 (D. Colo. Mar. 19, 2013), in which the court declined to apply the special relationship doctrine.

In *DeRay*, police arrested an individual (to whom the Court will refer as "decedent" for reasons that will become clear), who unlocked the door of a moving police car while on the highway, fell out of the car, started to run, and was struck and killed by an oncoming car. *Id.* at *2. Granting a motion for summary judgment, the *DeRay* court stated that it was "difficult . . . to conclude that it was that custodial

---

[5] Although all Individual Defendants make this argument, the Court focuses on Trebelhorn because, as noted above, the Court will dismiss without prejudice the substantial due process-special relationship claim against the other Individual Defendants. (*See* ECF No. 33 at 7 (Trebelhorn and Chavarria); ECF No. 32 at 6 (Williams); ECF No. 36 at 8 (Ensign); ECF No. 45 at 8 (Quayle).)

relationship that caused the harm. . . . Here, the harm resulted not from [the decedent's] inability to act on [his] own behalf, but instead from his ability to do so." *Id.* at *5. The court thus found that the special relationship doctrine was inapplicable because the plaintiff failed to produce sufficient evidence to satisfy the causation element. *Id.*[6] Notably, *DeRay* was decided on a motion for summary judgment. At the motion to dismiss stage, the court found that decedent's estate had adequately alleged a claim where decedent was "exhibiting obvious signs of suicidal impulses," officers were informed by decedent's mother that he was depressed and suicidal, and the officers failed to take any action to ensure that the decedent did not harm himself while in police custody despite the availability of safety restraints in the police vehicle. *DeRay v. City of Colo. Springs*, 2012 WL 1901220, at *6 (D. Colo. May 25, 2012) ("*DeRay II*").

Similarly, in this case at the motion to dismiss stage, Plaintiffs have generally alleged that Christensen was exhibiting signs of increased distress during the phone calls on Trebelhorn's watch (ECF No. 27 ¶¶ 98–100), that Trebelhorn knew Christensen was depressed and suicidal (*id.* ¶¶ 88–89), and that Trebelhorn failed to take

_____

[6] In *DeRay*, it was less clear that the decedent was in custody. The decedent had been arrested and taken into police custody, but attempted to escape by exiting the vehicle and running along the highway. *DeRay*, 2013 WL 1149550, at *5. Despite stating that the decedent was involuntarily in police custody, the court implicitly acknowledged that the decedent may not have been in custody: the court went on to analyze the plaintiff's claim under the "danger creation" theory, which the court noted typically applies when a victim is not in state custody. *Id.* Moreover, when the decedent was in custody in the police car, he was not "dependent on the state for his basic needs." *See Dahn*, 867 F.3d at 1181.

In the present case, there is far less ambiguity: the Tenth Circuit has stated that the special relationship doctrine applies when a person is "involuntarily committed to a mental institutions." *Martinez v. Uphoff*, 265 F.3d 1130, 1133 n.3 (10th Cir. 2001). Christensen was involuntarily held at a mental health facility in the Detox Unit and was under supervision for suicidal ideation. And she was far more reliant on Defendants for her basic needs than the decedent in *DeRay*.

appropriate actions to prevent harm, despite the availability of such protections (*id.* ¶¶ 100, 114–16). Taken as true, these factual allegations are sufficient to establish a causal link between Trebelhorn's alleged abdication of her professional duties and Christensen's suicide. *See DeRay II*, 2012 WL 1901220, at *6.

Having found that Plaintiffs have adequately pled the challenged elements of the substantive due process based on a special relationship claim asserted against Trebelhorn, the Court will deny that portion of the Staff Motion which applies to her.

       c.    *Supervisory liability*

In addition, Ensign also argues that Plaintiffs fail to state facts to support a supervisory liability claim, in particular by failing to satisfy the causation element of such a claim. (*Id.* at 7.) In addition to the allegations recounted above in Part I.A.1.a.2, above, Plaintiffs allege that Ensign "deliberately evaded his duty to ensure that subordinate Defendant staff followed such protocols" and "actively and/or tacitly encourages his subordinate staff . . . to prioritize cost savings over quality of care." (*Id.* ¶¶ 117, 126.)

Supervisory officials may be held liable in their individual capacity. Section 1983 does not, however, allow claims against supervisors under a theory of *respondeat superior* liability. *Cox v. Glanz*, 800 F.3d 1231, 1248 n.9 (10th Cir. 2015). A § 1983 claim against a defendant is his personal capacity for supervisory liability "allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, or implements a policy which subjects, or causes to be subjected that plaintiff to the deprivation of any rights secured by the Constitution." *Id.* at 1248 (alterations

incorporated).  Thus, a plaintiff must show that a subordinate violated the Constitution, and that there exists an "affirmative link" between the supervisor and the constitutional violation.  *Id*.  An "affirmative link" requires "(1) personal involvement, (2) sufficient causal connection, and (3) culpable state of mind."  *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010).

Plaintiffs fail to establish supervisory liability on the part of Ensign for the substantive due process-special relationship claim.  As discussed above, Plaintiffs have alleged that a subordinate, Trebelhorn, violated the Constitution by allegedly substantially abdicating her professional duty in a conscience-shocking manner. However, Plaintiffs have not alleged facts sufficient to establish the type of affirmative link between *Ensign* and the alleged constitutional violation committed by *Trebelhorn* that is required by the Tenth Circuit.  *See Dodds*, 614 F.3d at 1195.  Specifically, Plaintiffs have not alleged a sufficient causal connection between Ensign's alleged conduct (encouraging staff to prioritize cost over quality of care) and Trebelhorn's alleged violation of Christensen's substantive due process rights.  Because Plaintiffs may succeed in alleging facts which plausibly assert such a claim in an amended complaint, the Court will also dismiss the substantive due process claim against Ensign without prejudice.

2.     Deliberate Indifference to Serious Medical Needs (Claim 2)

Plaintiffs also claim that the Individual Defendants were deliberately indifferent to Christensen's serious medical needs in violation of § 1983.  Claims based on suicide while in custody are "considered and treated as claims based on the failure of jail officials to provide medical care for those in their custody."  *Barrie v. Grand Cnty., Utah*,

119 F.3d 862, 866 (10th Cir. 1997).  Such claims are judged under the "deliberate indifference to serious medical needs" test established by the Supreme Court in *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  *Id.*; *see Estate of Hocker by Hocker v. Walsh*, 22 F.3d 995, 1000 (10th Cir. 1994).

Traditionally, the "deliberate indifference" test has an objective and subjective component: (1) the harm suffered must be sufficiently serious; and (2) the prison official must know of and disregard an excessive risk to inmate health or safety.  *DuBois v. Payne Cnty. Bd. of Cnty. Comm'rs*, 543 F. App'x 841, 846 (10th Cir. 2013).  In the context of liability for prison suicide, "the risk of, or potential for, suicide involves a sufficiently serious medical need and/or harm such that the objective prong" is likely satisfied.  *Id.*  The subjective component requires the defendant to have actual knowledge that the specific individual in question presented a substantial risk of suicide.  *Cox*, 800 F.3d at 1250.

Defendants do not contest that Christensen's mental condition was sufficiently serious to meet the objective component of the test.  (ECF No. 32 at 10; ECF No. 33 at 10; ECF No. 36 at 8–9; ECF No. 45 at 10–12.)  Accordingly, our inquiry here is whether Plaintiffs adequately allege facts to support the subjective component of the deliberate indifference test as it pertains to each Individual Defendant.

a.  *Standard for deliberate indifference claims*

In *Estelle*, the Supreme Court held that deliberate indifference to serious medical needs of a prison constitutes cruel and unusual punishment under the Eighth Amendment.  429 U.S. at 104.  The legal standards governing a prisoner's right to

19

constitutionally adequate medical care have been developed almost entirely under the Eighth Amendment's "cruel and unusual punishments" clause. But "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions." *Ingraham v. Wright*, 430 U.S. 651, 702 n.40 (1977). Thus, for pretrial detainees (the Court assumes, as apparently do the parties, that for purposes of this motion Christensen's status was legally akin to that of a pretrial detainee), the source of the constitutional right to adequate medical care is the Fourteenth Amendment, not the Eighth. *See Bell v. Wolfish*, 441 U.S. 520, 535 & n.16 (1979). This distinction between the Eighth and Fourteenth Amendments has long been treated as one without a difference. *See, e.g.*, *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002) (noting the distinction but stating that a "claim for denial of medical attention" in pretrial custody proceeds under "an analysis identical to that applied in Eighth Amendment cases").

Plaintiffs argue that the U.S. Supreme Court's June 2015 decision in *Kingsley v. Hendrickson*, changed the elements of a Fourteenth Amendment claim brought by pretrial detainees not only for excessive force claims, but also for deliberate indifference claims. (ECF No. 51 at 26–27.) In *Kingsley*, the Supreme Court held that the Eighth Amendment standard for excessive force claims brought by prisoners—requiring that defendants act "maliciously and sadistically to cause harm"—does not apply to Fourteenth Amendment excessive force claims brought by pretrial detainees. 135 S. Ct. 2466, 2475 (2015) (internal quotation marks omitted). It reasoned that unlike convicted prisoners, pretrial detainees "cannot be punished at all, much less 'maliciously or

sadistically.'" *Id.* (internal quotation marks omitted). Thus, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 2473.

While the Tenth Circuit has recognized that *Kingsley* applies to excessive force claims, *see, e.g.*, *Kessler v. Denver*, 928 F.3d 1155, 1163 (10th Cir. 2019), it has not decided whether or how *Kingsley*'s objective reasonableness standard applies to a pretrial detainee's deliberate indifference claims, *see Burke v. Regalado*, 935 F.3d 960, 992 n.9 (10th Cir. 2019); *Estate of Vallina v. Cnty. of Teller Sheriff's Office*, 757 F. App'x 643, 646 (10th Cir. 2018). In *Perry v. Durborow*, the Tenth Circuit questioned the continuing viability of the subjective component of a deliberate indifference claim in light of *Kingsley*, but nonetheless applied the two-pronged objective and subjective standard because the parties had not briefed the issue. 892 F.3d 1116, 1122 n.2 (10th Cir. 2018).

As the Tenth Circuit recognized in 2018, circuits are split on whether *Kingsley* alters the standard for deliberate indifference claims for pretrial detainees.

> The Second, Seventh, and Ninth Circuits have interpreted Kingsley as displacing prior subjective requirements. *See Miranda v. Cnty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018); *Darnell v. Pineiro*, 849 F.3d 17, 34–35 (2d Cir. 2017); *Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc). These courts have adopted an objective test requiring reckless disregard. *See Miranda*, 900 F.3d at 353; *Darnell*, 849 F.3d at 36; *Castro*, 833 F.3d at 1071. In contrast, the Fifth, Eighth, and Eleventh Circuits have held that *Kingsley* applies only to excessive force claims and does not extend to claims related to conditions of confinement or inadequate medical care. *See Whitney v. City of St. Louis*, 887 F.3d 857, 860 n.4 (8th Cir. 2018); *Dang ex rel. Dang v. Sheriff, Seminole Cnty.*, 871 F.3d

21

> 1272, 1279 n.2 (11th Cir. 2017); *Alderson v. Concordia Par.*
> *Corr. Facility*, 848 F.3d 415, 420 (5th Cir. 2017).

*Estate of Vallina*, 757 F. App'x at 646–47.  However, in that same case, the Tenth

Circuit declined to decide the issue because the plaintiffs failed to raise the *Kingsley*

issue before the district court.

      In the absence of clear guidance from the Tenth Circuit that *Kingsley* should be

extended to apply also to deliberate indifference claims, the Court will follow existing

precedent from that court on the elements of a deliberate indifference claim brought by

a pretrial detainee.  *See Weitzman v. McFerrin*, 2019 WL 5101481, at *3 (D. Colo. Oct.

11, 2019) ("Given that the Tenth Circuit's last published statement on the appropriate

test indicates that the standard has not changed at this time, the Court proceeds on the

basis that the Fourteenth and Eighth Amendment standards are identical for purposes

of Plaintiff's claims." (citation omitted)).

      b.    *Chavarria, Quayle, and Williams*

      Plaintiffs allegations regarding Chavarria, Quayle, and Williams are that they

knew of Christensen's risk of suicide, and, after evaluating her (or being told that she

was a risk), failed to take steps to insure that other staff members were properly

implementing facility protocols.  Specifically, Plaintiffs allege that Chavarria assessed

Christensen when she returned to Crossroads from Mercy Medical Center, but did not

assess Christensen's emotional, physical, or psychological state.  (ECF No. 27

¶¶ 94–95.)  Plaintiffs allege that Williams performed a safety assessment of

Christensen because of Christensen's obvious distress at her commitment.  (*Id.* ¶ 90.)

Williams confirmed that Christensen was "very escalated."  (*Id.*)  Plaintiffs allege that

Bramble told Quayle that Christensen was at a high risk for completing suicide. (*Id.* ¶ 87.) Plaintiffs allege that Chavarria, Quayle, and Williams failed to take "reasonable and professionally-appropriate protocols" including, among other things, "actively observing her (or causing her to be actively observed by Crossroads staff) at *all* times" and "never allowing her to be alone unless she was being actively monitored by Crossroads staff." (*Id.* ¶ 116.) Plaintiffs also allege, however, that Christensen's calls were monitored by Trebelhorn (*id.* ¶¶ 97, 99) and that Christensen was "within the line of sight of facility staff . . . responsible for the constant supervision and monitoring of Ms. Christensen" when Christensen entered the bathroom with the long towel (*id.* ¶ 102).

These allegations attempt to impose a type of supervisory liability on individuals who are not alleged to be supervisors. Moreover, Plaintiffs allege elsewhere that other individuals were responsible for constantly observing Christensen and, perhaps, failed to adhere to protocol. The facts pled with regard to Chavarria, Quayle, and Williams and the reasonable inferences therefrom do not support a claim that they disregarded an excessive risk to Christensen's health or safety. *See DuBois*, 543 F. App'x at 846. The Court dismisses the deliberate indifference claim against Chavarria, Quayle, and Williams without prejudice, for the same reasons Plaintiffs' substantive due process claim was dismissed without prejudice.

        c.    *Ensign*

Plaintiffs fail to state a supervisory liability, deliberate indifference claim against Ensign. As discussed above, supervisory officials may be held liable in their individual

capacity only where a defendant-supervisor "creates, promulgates, or implements a policy" which subjects a plaintiff to constitutional deprivations or causes a plaintiff to be subject to constitutional deprivations. *Cox*, 800 F.3d at 1248. An "affirmative link"—personal involvement, sufficient causal connection, and a culpable state of mind—between the supervisor and the constitutional violation is required. *Dodds*, 614 F.3d at 1195.

Plaintiffs allege that Ensign knew of Christensen's suicide risk when he reviewed her screening form, and that he was "responsible for the monitoring, supervision, care and treatment" of Christensen. (ECF No. 27 ¶¶ 66, 85.) They also allege that Ensign "deliberately evaded his duty to ensure that subordinate Defendant staff followed such protocols" and "actively and/or tacitly encourages his subordinate staff . . . to prioritize cost savings over quality of care." (*Id.* ¶¶ 117, 126.)

However, Plaintiffs do not allege that Ensign was aware of any lapse in monitoring by his staff, much less a lapse that Ensign ignored. Nor are there sufficient facts to establish a causal connection between Ensign's alleged conduct—belatedly signing Christensen's screening form and generally prioritizing cost savings over quality of care—directly to the alleged violations that resulted in Christensen's ability to take her own life. In particular, Plaintiffs have not alleged that certain protocols or procedures were not put into place for Christensen because of Ensign's actions. Absent such allegations, Plaintiffs fail to state a claim for deliberate indifference against Ensign. The Court also dismisses this claim against him without prejudice.

        d.    *Trebelhorn*

Plaintiffs allege that Trebelhorn was responsible for monitoring patient calls in

24

the Detox Unit, and that Christensen was obviously distraught after her calls. Trebelhorn argues that Plaintiffs fail to allege that she "was actually aware of the notes in the electronic records," "in fact monitored Ms. Christensen's calls," or "in fact observed [Christensen's] distress." However, Trebelhorn overlooks Plaintiffs' allegations that during and after the first call, Christensen was "visibly distraught" and "slumped to the floor" and the second call "again . . . was supervised by Defendant Trebelhorn." (ECF No. 27 ¶¶ 98–99.) While not a model of clarity, the allegations reasonably imply that Trebelhorn actually supervised at least the second call, and that Christensen's distress and precarious mental state were obvious, particularly given her presence in the Detox Unit.

Assuming, as the Court must at this stage of the proceedings, that these facts are true, it is difficult to conceive of a way that Trebelhorn, having monitored the calls in person, could have failed to observe Christensen's obvious and acute distress. In spite of this, and even though Christensen was purportedly under the scrutiny which should attend patients in the Detox Unit, Christensen was allowed to proceed to a locked bathroom with a fixed shower curtain bar and long towel in a state of heightened emotional distress. Plaintiffs have plead sufficient facts to establish that Trebelhorn had actual knowledge that Christensen presented a substantial risk of suicide, and that Trebelhorn disregarded that risk, and thus have met the subjective prong of the deliberate indifference test as to this Defendant.

3.    Failure to Train or Supervise (Claim 3)

Plaintiffs also assert a § 1983 "failure to train" claim against Ensign. (ECF No. 27 ¶¶ 154–162.) Ensign moves to dismiss Plaintiffs' supervisory liability claim that

Ensign failed to train or supervise his employees.  (ECF No. 36 at 7–10.)  A supervisor or policy maker may be held liable for acts of individual employees under a failure-to-train theory.  *Dodds*, 614 F.3d at 1211, 1213 (Tymkovich, J., concurring).  To be clear, it appears that Plaintiffs assert the failure to train claim against Ensign as a supervisor in his individual capacity, and not a municipal liability claim against Ensign as a policymaker for Axis.  (ECF No. 51 at 34–37.)  Thus the standard is the same supervisory liability standard discussed above in Part I.A.1.c, namely an affirmative link between Ensign as the supervisor and the constitutional violation.  *See Dodds*, 614 F.3d at 1195.  An "affirmative link" requires "(1) personal involvement, (2) sufficient causal connection, and (3) culpable state of mind."  *Id.*

Plaintiffs allege that Ensign was a supervisor able to make decisions about training Axis employees.  (ECF No. 27 ¶ 156.)  They also allege that Ensign failed to train or supervise Axis employees, and that the failure resulted in inadequate care for Christensen ultimately leading to her death.  (*Id.* ¶¶ 155–162.)  They claim, further, that the training (or lack thereof) regarding how to provide necessary and appropriate medical care was a deliberate choice by Ensign among several other available alternatives.  (*Id.* ¶¶ 155–56.)  Finally, they allege that failure to train staff to provide appropriate medical care for suicidal patients would likely result in a violation of constitutional rights, that the need for such training is obvious, and the inadequacy of the training likely to result in constitutional harm.  (*Id.* ¶ 157.)

Plaintiffs allegations about the deficiencies in the training are somewhat vague.  "We have noted that the nature and specificity of the allegations required to state a

plausible claim will vary based on context." *Barnes v. Harris*, 783 F.3d 1185, 1196 (10th Cir. 2015) (alteration incorporated). "Prisoners claiming constitutional violations by officers within the prison [ ] rarely suffer information asymmetry . . . [because] prisoners ordinarily know what has happened to them." *Gee v. Pacheco*, 627 F.3d 1178, 1185 (10th Cir. 2010). However, in this case, Christensen "who was in the best position to observe what was and was not happening to [her], and therefore in the best position to provide facts . . . is dead." *Estate of Walter v. Corr. Healthcare Companies, Inc.*, 232 F. Supp. 3d 1157, 1164 (D. Colo. 2017). As a consequence, on this record there does exist an "asymmetry of information" beyond what is typical in similar cases. *Id.* (citing *Tantlinger v. Duchaine*, 2015 WL 3941503, at *4 (D. Colo. June 26, 2015)).

Given this asymmetry of available information, Plaintiffs need not plead their failure to train claim with greater factual specificity at this time. Plaintiffs have pled a constitutional violation and plausibly alleged an affirmative link between Ensign as a supervisor and that violation. The Court will therefore deny Ensign's Motion with respect to the failure to train claim. However, at summary judgment or trial, Plaintiffs must be prepared to state and prove with greater specificity how the training provided by Ensign fell short of what was legally required.

**B.      Axis's Motion to Dismiss (ECF No. 35)**

Axis is a business entity, not a natural person. In the Tenth Circuit, an entity working on the government's behalf can only be liable through the municipal liability framework established by the Supreme Court in *Monell v. Department of Social Services*, 436 U.S. 658 (1978). *See Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216

(10th Cir. 2003); *Smedley v. Corr. Corp. of Am.*, 175 F. App'x 943, 945–46 (10th Cir. 2005). Under *Monell*, a municipality cannot be liable under § 1983 solely because it employs a person who violated a plaintiff's constitutional rights. 436 U.S. at 694. Instead, a municipality—or, here, a private entity allegedly under contract to provide services to a municipality that the municipality itself would otherwise be required to provide—can only be liable under 42 U.S.C. § 1983 for damages when the entity's "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [constitutional] injury." *Id.*

"A plaintiff alleging a municipal liability claim must therefore identify a government policy or custom that caused the injury and then demonstrate that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013) (internal quotation marks omitted). The three elements of a municipal liability claim can be summarized as: (1) official policy or custom, (2) causation, and (3) state of mind. *Id.* at 770. If Plaintiffs establish these elements, then Axis may liable, even if the employees who acted pursuant to the policy are not defendants. *See Cordova v. Aragon,* 569 F.3d 1183, 1193–94 (10th Cir. 2009).

A municipal policy or custom may be (1) an officially promulgated policy; (2) an informal custom amounting to a widespread practice; (3) the decisions of employees with final policymaking authority; (4) the ratification by final policymakers of the decisions of their subordinates; or (5) the failure to adequately train or supervise employees. *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010); *see*

*Estate of Martinez v. Taylor*, 176 F. Supp. 3d 1217, 1230 (D. Colo. 2016).

To satisfy the state of mind element, Plaintiffs must allege that Axis maintained its policy or custom with "'deliberate indifference' as to its known or obvious consequences."  *Schneider*, 717 F.3d at 770 (citation omitted).

> In most instances, notice can be established by proving the existence of a pattern of tortious conduct.  In a "narrow range of circumstances," however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a "highly predictable" or "plainly obvious" consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations.

*Barney v. Pulsipher*, 143 F.3d 1299, 1307–08 (10th Cir. 1998).

With respect to the substantive due process special relationship claim and deliberate indifference claims, however, Axis argues that Plaintiffs have failed to establish causation or a sufficiently culpable state of mind.  (ECF No. 35 at 6–9.) Notably, however, in its Motion Axis did not address the official policy or custom alleged by Plaintiffs that forms the basis for its substantive due process and deliberate indifference claims against Axis—namely, "failing to adhere to protocols . . . for high-risk patients even [though] these protocols are clearly appropriate for such patients."  (ECF No. 35 at 6–11; *see* ECF No. 27 ¶ 117.)  Axis's Reply contends that Plaintiffs' allegations of an official policy or custom are conclusory, but primarily does so in the context of the failure to train claim.  (ECF No. 64 at 3.)  Moreover, Axis cannot raise these arguments for the first time in its Reply, and they will not be considered by the Court in its evaluation of the substantive due process and deliberate indifference claims asserted against Axis.  *See Harrell*, 642 F.3d at 918 (arguments raised for the first time

in a reply brief are deemed waived).

      1.     <u>Violation of Substantive Due Process Under the Special Relationship
Doctrine (Claim 1)</u>

Axis argues that the special relationship doctrine should not apply because
Plaintiffs cannot allege a causal relationship or a sufficiently culpable state of mind.
(ECF No. 35 at 8 (incorporating ECF No. 32 at 6–10).)

Axis repeats the arguments made by the Individual Defendants with respect to
causation. (*Id.* at 8–9.) Such arguments about Axis's role as the cause (or not) of
Christensen's injuries are misplaced. Plaintiffs cannot hold Axis directly liable; Plaintiffs
may only hold Axis liable through the municipal liability framework, which provides that
Axis may be liable if one of its employees inflicted a constitutional injury pursuant to an
Axis policy or custom. *See Monell*, 436 U.S. at 694.

As discussed above, Plaintiffs have stated a substantive due process claim
under the special relationship doctrine against Trebelhorn. Plaintiffs further allege that
Trebelhorn's actions were consistent with the unwritten custom of "failing to adhere to
the protocols . . . for high-risk patients." (ECF No. 27 ¶ 117.) Plaintiffs have therefore
pled the first two elements of *Monell* liability, namely that an official policy or custom
was the cause of Christensen's constitutional injuries.

Axis also argues that Plaintiffs have failed to plead that Axis maintained a
custom of failing to adhere to protocols with deliberate indifference. (ECF No. 35 at 9.)
It suggests that there is "no evidence that Axis was on notice of a pattern of tortious
conduct of its employees" or that "Christensen would be inappropriately supervised."
(*Id.*) Plaintiffs allege, however, that Axis had a widespread custom of failing to follow

protocol (ECF No. 27 ¶ 117), and  that Axis employees failed to implement or follow

such protocol with respect to Christensen (ECF No. 51 at 31).  Taken as true, Plaintiffs'

unchallenged allegation that there was a widespread custom of failing to adhere to

relevant protocol leads to a reasonable and plausible inference that the policymakers

were deliberately indifferent to the existence of that custom.  As such, Plaintiffs have

stated a municipal liability claim against Axis for violation of Christensen's substantive

due process rights under the special relationship doctrine.

      2.      <u>Deliberate Indifference to Serious Medical Needs (Claim 2)</u>

Axis also contends that the municipal liability claim for deliberate indifference

fails because Plaintiffs have not alleged a requisite state of mind.  (ECF No. 35 at 9.)

For the same reasons that the Court finds Plaintiffs adequately alleged the state of

mind element for the substantive due process claim, Plaintiffs have adequately alleged

this element of a deliberate indifference claim against Axis.  Taking the unchallenged

allegation that Axis had a widespread custom of employees failing to follow protocol, a

reasonable and plausible inference is that policymakers were indifferent to that custom.

The Court will therefore also deny Axis's Motion with respect to the deliberate

indifference claim asserted against it.

      3.      <u>Failure to Train (Claim 3)</u>

Axis also moves to dismiss the failure to train claim on the grounds that Plaintiffs

have failed to allege facts supporting a finding that Axis knew that a particular omission

in its training program would cause a constitutional injury, or that it consciously

disregarded an obvious omission to its training.  (ECF No. 35 at 11.)

"In limited circumstances, a local government's decision not to train certain

employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "A municipality can be liable where the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Schneider*, 717 F.3d at 773 (internal quotation marks and citation omitted).

Plaintiffs allege that Axis failed to train employees to provide necessary and appropriate medical care to mental health patients in acute circumstances such as those with which Christensen presented. (ECF No. 27 ¶ 155.) They also allege that Trebelhorn failed to provide appropriate intervention or care for Christensen after her phone calls, and that Christensen—despite her fragile and deteriorating mental state—was allowed to take a long towel into a locked bathroom in the view of Axis staff. (*Id.* ¶¶ 100–02.) Plaintiffs also allege that Christensen entered the bathroom in the line of sight of facility staff. (*Id.* ¶ 102.) Under the circumstances, failing to provide training to staff on how to supervise suicidal patients, such that a suicidal patient would be allowed to take a long towel into a locked bathroom with a fixed curtain rod for more than an hour, is "so obvious, and the inadequacy so likely to result in the violation." *Schneider*, 717 F.3d at 773; *see Barney*, 143 F.3d at 1307–08 ("In a 'narrow range of circumstances,' however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring

situations, thus presenting an obvious potential for constitutional violation.").

At this pleading stage, more is not required, particularly where the evidence is most likely in the hands of Defendants. Plaintiffs have stated a claim that Axis was deliberately indifferent to the need for proper training with regard to patients in Christensen's circumstances. For these reasons, the Court will deny Axis's Motion with respect to the failure to train claim.

    4.    <u>Violation of Rehabilitation Act § 504 (Claim 7)</u>

Plaintiffs also claim that Axis violated Section 504 of the Rehabilitation Act ("§ 504") by either failing to reasonably accommodate her disability or mistreating her because of her disability.

Under § 504, "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794. "A prima facie case under § 504 consists of proof that (1) plaintiff is [disabled] under the Act; (2) [s]he is 'otherwise qualified' to participate in the program; (3) the program receives federal financial assistance; and (4) the program discriminates against plaintiff." *Hollonbeck v. U.S. Olympic Comm.*, 513 F.3d 1191, 1194 (10th Cir. 2008). The fourth element is generally understood to require discrimination solely by reason of the disability. *See Johnson by Johnson v. Thompson*, 971 F.2d 1487, 1492 (10th Cir. 1992). (ECF No. 51 at 39.) If the plaintiff wishes to recover compensatory damages, he or she must additionally prove that the "discrimination was intentional." *Barber ex rel. Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1228 (10th Cir. 2009); *Cohon ex*

*rel. Bass v. New Mexico Dep't of Health*, 646 F.3d 717, 725 (10th Cir. 2011).

Axis argues that Plaintiffs have failed to state any facts to support the allegation that Axis discriminated "solely by reason of" Christensen's disability. (ECF No. 35 at 5–6.) The Court agrees. Plaintiffs' failure to accommodate theory contends that Christensen was denied participation in Axis's programs and services because she died, as a result allegedly of Axis's failure to modify its detox program to include appropriate suicide prevention protocols. (ECF No. 51 at 40–41.) Plaintiffs argue that had Axis modified its detox program to include certain protocols, Christensen would not have had the opportunity to commit suicide, and therefore could have participated in Axis's programming. Plaintiffs do not, however, allege that Christensen was denied or prevented from accessing reasonable accommodations *because of her disability*. Plaintiffs have therefore failed to state a § 504 reasonable accommodation claim.

Plaintiffs also raise a disparate treatment claim premised on the idea that Christensen was treated differently than other patients in the Detox Unit. Specifically, they allege that Axis and its employees withheld care from Christensen compared to other Crossroads residents without her disabilities because they considered her to be a "nuisance" and "inconvenience" because of her disabilities. (*Id.* at 43–44.) They argue that Christensen was left to "just deal" with her problems, and the Crossroads staff "intentionally fail[ed] to fully, timely, and adequately report her grave and growing risk of self-harm." (*Id.* at 43.)

Christensen was diagnosed with Bipolar II disorder, Borderline Personality Disorder, bipolar disorder, a "chronic mental disorder with psychotic features," and alcohol dependence. (ECF No. 27 ¶¶ 26, 83.) She developed a habit of self-

34

medicating, drank heavily, engaged in self-harm, and on at least one occasion took drugs for which she did not have a prescription. (*Id.* ¶¶ 25, 60.) Plaintiffs do not specify which of Christensen's disabilities or mental health issues were being treated at Crossroads, or which disabilities the other Crossroads patients lacked. It is, however, reasonable to infer that other patients were suffering one or more mental health or addiction issues, especially in a facility like Crossroads, and it is unclear how these other patients were differently situated from Christensen.

Thus, on the facts pled, it is unclear how Christensen was discriminated against by reason of her disability. Because Plaintiffs have failed to connect Axis's actions to Christensen's disability, they have failed to state a § 504 claim. And while the Court will also grant that portion of Axis's Motion which seeks dismissal of Plaintiffs' § 504 claim without prejudice, Plaintiffs are on notice that the Court views this as a particularly weak (albeit novel) claim in these circumstances.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Defendant Morgan Williams's Motion to Dismiss (ECF No. 32) is GRANTED and Claims 1 & 2 against Williams are DISMISSED WITHOUT PREJUDICE;

2. Defendants' Ann Trebelhorn and Alfredo Chavarria's Motion to Dismiss (ECF No. 33) is GRANTED IN PART and DENIED IN PART as follows:

   a. Claims 1 & 2 against Chavarria are DISMISSED WITHOUT PREJUDICE; and

   b. The remainder of the Motion is DENIED;

3. Defendant Brian Ensign's Motion to Dismiss (ECF No. 36) is GRANTED IN

PART and DENIED IN PART as follows:

    a.      Claims 1 & 2 against Ensign are DISMISSED WITHOUT PREJUDICE; and

    b.      The remainder of the Motion is DENIED;

4.    Defendant Debra Quayle's Motion to Dismiss (ECF No. 45) is GRANTED and Claims 1 & 2 against Quayle are DISMISSED WITHOUT PREJUDICE;

5.    Defendant Southwest Colorado Mental Health Center, Inc. d/b/a Axis Health System's Motion to Dismiss (ECF No. 35) is GRANTED IN PART and DENIED IN PART as follows:

    a.      Claim 7 is DISMISSED without prejudice; and

    b.      The remainder of the Motion is DENIED;

6.    Parties are instructed to contact U.S. Magistrate S. Kato Crews no later than **December 20, 2019** to set a status conference, or other such other proceeding that Judge Crews deems appropriate to move this litigation forward.

Dated this 18th day of December, 2019.

BY THE COURT:

_____

William J. Martínez
United States District Judge